UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO. 04-10288-RWZ |
| v. | ) | |
| | ) | |
| MATTHEW CREAM, | ) | |
| Defendant | ) | |
| | ) | |

**Government's Sentencing Memorandum**

**Introduction**

The United States of America, by Michael J. Sullivan, United States Attorney, and Michael J. Pelgro, Assistant U.S. Attorney, hereby files this sentencing memorandum to aid the Court in its disposition of the above-captioned action.  As set forth more fully below, the government submits that defendant Matthew Cream ("Cream") should be held accountable for a much higher quantity of OxyContin pills than the Probation Department has calculated and that the applicable Guideline Sentencing Range ("GSR") is much higher than the one calculated by the Probation Department (33-41 months).  In addition, this Court should not vary below the properly-calculated GSR based on upbringing, family background, and the other reasons asserted in Cream's sentencing memorandum dated April 20, 2006.

**Argument**

Offense Level

The Probation Department has calculated that Cream is responsible only for 113 80-milligram OxyContin pills and that,

after converting them to their equivalent weight in marijuana and after taking into account the undisputed fact that one of the sales occurred within a public housing development, his Base Offense Level ("BOL") is 22. *See* PSR at ¶¶ 90-100. This calculation is based solely upon the number of OxyContin pills actually distributed by Cream in two separate transactions – one (100 pills) involving an undercover agent and one (13 pills) in which Cream was the source of supply to a lower-level dealer, defendant Guiseppe "Joe" Torrente, who sold the pills to an undercover agent. *See* PSR at ¶¶ 33-42. The government submits that this calculation under-represents the true quantity of OxyContin pills for which Cream should be held accountable since it fails to take into account the relevant conduct for which Cream is properly accountable. As such, it fails to capture the "real" offense conduct embraced by the conspiracy count.

As provided to the Probation Department and to Cream, cooperating co-defendant Joseph Baldassano ("Baldassano") has provided information, and will testify, that he was close friends with Cream, that he and Cream were involved together in the use and distribution of OxyContin pills, and that Cream was his "partner" in the drug business approximately 90% of the time. Baldassano will testify that he began obtaining OxyContin pills from defendant Carlos Espinola ("Espinola") in or about April 2002 and that he obtained approximately 200 pills per week from

2

that time to mid-2004.  Baldassano will testify that Cream was

his trusted associate in this business and that Cream either

handled the pills with Baldassano and/or had knowledge that

Baldassano was distributing this quantity of pills.  Indeed, at

one point during the conspiracy, Baldassano moved from Gloucester

to an apartment in Lowell and Cream moved in with him.

Baldassano will testify that their drug business continued after

this move and that customers often came to the Lowell apartment

to purchase OxyContin pills.

Based on the foregoing, it is clear that Cream should be

held accountable for the 100 80-milligram pills that were

supplied on June 7, 2004 by defendant Jose Melo ("Melo") to

Baldassano, who sold them to an undercover agent.  *See* PSR at

¶¶64-75.  During this transaction, which moved from Gloucester to

Peabody, Cream was involved with Baldassano prior to the deal; he

and Matthews actually followed the car containing Baldassano and

the undercover agent as it traveled from Gloucester to Peabody.

*See* PSR at ¶ 72.[1]  Indeed, at Baldassano's direction, the car

containing Cream and Matthews picked up defendant Joseph Allen

("Allen") in front of Baldassano's residence in Gloucester for

the ride to Peabody.  *See* PSR at ¶ 72.  During the ride,

---

[1]Cream's assertion that his "sole involvement" in the June 7
transaction "was being a passenger in a motor vehicle that picked
up Joseph Baldassano after the transaction was completed," *see*
Def. Sentencing Memo at 7, is simply incorrect.

Baldassano made a number of statements about his OxyContin distribution business, including that Cream was currently his "partner" with whom he "splits everything 50-50." *See* PSR at ¶ 74. Immediately after the transaction, Cream, Matthews, and Allen picked up Baldassano at Melo's residence in Peabody. *See* PSR at ¶ 75. Cream should be held accountable for the 100 80-milligram OxyContin pills distributed on this occasion.[2]

Immediately after the transaction on June 10, 2004 involving the sale of 500 OxyContin 80-milligram pills, Cream and Allen again picked up Baldassano and drove him back to Gloucester. *See* PSR at ¶¶ 76-82. During the negotiations for another 500-pill transaction on June 29, 2004, Cream was present with Baldassano; they were arrested together by DEA that evening. *See* PSR at ¶83. Cream should be held accountable for an additional 1,000 80-

---

[2]The Probation Department has changed its opinion on whether to hold Cream responsible for this transaction, finding insufficient Baldassano's recorded statement about Cream being his partner in the drug business. *See* PSR at ¶96 and Response to Government's Objections. However, the statement was made at a time when Baldassano had no knowledge that he was being recorded by law enforcement, a factor that enhances its credibility. Since the statement comes directly from Baldassano about his own drug business, it certainly deserves more weight than the statement made by Behsman reflecting his interpretation of Baldassano's business. The above facts, together with Baldassano's direct testimony, establish that Cream had full knowledge of this transaction and was directly involved in it. Even without Baldassano's testimony, the above undisputed facts demonstrate that Cream is responsible for the transaction since it was a reasonably foreseeable act of a co-conspirator in furtherance of the jointly undertaken criminal activity. *See* U.S.S.G. § 1B1.3(a)(1)(B).

milligram OxyContin pills based on this completed deal and the
agreed-upon but uncompleted deal.  *See* U.S.S.G. § 2D1.1, App.
Note 12.

The above information provided by Baldassano is consistent
with, and corroborated by, the statements made by defendant Jason
Matthews ("Matthews") on February 5, 2004.[3]  *See* PSR at ¶¶ 46–50.
In that statement, Matthews admitted that large quantities of
OxyContin pills were obtained from Espinola, that he had been
involved in over 50 such transactions with Espinola, and that his
partner in this activity was Cream, "who recently moved to
Lowell."  *See* PSR at ¶ 48.  Matthews stated that he and Cream
regularly split packages of 500 80-milligram OxyContin pills that
they obtained from Espinola.

Based on the foregoing, the government's position is that
Cream should be held accountable for over 18,000 80-milligram
OxyContin pills and that his BOL is 34.

Role In The Offense

Baldassano will testify that Cream was a trusted confidante
who was his "partner" in the OxyContin distribution business.
Indeed, the undisputed facts establish that, on January 22, 2004,
Cream supplied the pills to Torrente, who sold them to an
undercover agent.   Cream occupied a relative position higher

---

[3]As set forth above, Matthews was with Cream on the June 7,
2004 transaction.  Matthews was also with Cream and Baldassano
when they were arrested on June 29, 2004.  *See* PSR at ¶ 83.

than others, such as Torrente and defendant Archibald MacLeod, in
this conspiracy.  He was not a mere "runner" who took orders from
Baldassano.  As his status implies, he was an engaged partner who
contributed substantially to the widespread distribution of
OxyContin in the Cape Ann area.  While the government is not
advocating for a role enhancement, the Court should view Cream as
occupying a higher level in the conspiracy than other defendants
and impose a correspondingly higher sentence.

Applicable GSR

Based on the foregoing, the government submits that Cream's
Total Offense Level (after an acceptance-of-responsibility
reduction) is 31, that his Criminal History Category is II,[4] and
that the applicable GSR is 121-151 months.  The government
submits that the Court should impose a sentence within this GSR.

Proposed Variances

Notwithstanding Cream's opinion that the Court should treat
the Sentencing Guidelines as simply one of the factors to be
considered at sentencing, see Def. Sentencing Memo at 4-5, the
First Circuit has made clear that the Sentencing Guidelines
"continue in our view to be an important consideration in
sentencing, both in the district court and on appeal, which
should be addressed in the first instance by the sentencing

---

[4]This is the category that the Probation Department has
calculated.  See PSR at ¶¶ 112-117.

judge" and that a sentencing judge should give them "substantial weight" and should vary from the applicable GSR "if there are clearly identified and persuasive reasons why" a Guidelines sentence should not be imposed.  United States v. Jimenez-Beltre, 440 F.3d 514, 516-18 (1st Cir. 2006)(en banc).  In other words, the Sentencing Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. § 3553(a)(2000), because they are the only *integration* of the *multiple* factors and, with important exceptions, their calculations were based upon the actual sentences of many judges."  Id. at 518.

In considering whether or not to vary from an applicable GSR, a sentencing judge must ground the sentencing decision "in case-specific considerations" and not "in general disagreement with broad-based policies enunciated by Congress or the [Sentencing] Commission, as its agent."  United States v. Sagendorf, 2006 WL 1028777 at *2 (1st Cir. 4/20/06)(*quoting* United States v. Pho, 433 F.3d 53, 65 (1st Cir. 2006)).  A sentencing judge should not vary from an applicable GSR on the ground that "the guideline sentencing range for this offense 'seems high'" since "a judge-by-judge recalibration of the guidelines" would be "willfully idiosyncratic" and a "serious mistake."  Id.  *See also* United States v. Scherrer, 2006 WL 932550 at *2 (1st Cir. 4/12/06)(en banc)(observing that "our main concern is whether the court has adequately explained its reasons

for varying or declining to vary from the guidelines and whether

the result is within reasonable limits).

To be sure, there is no doubt that, after the Supreme

Court's decision in United States v. Booker, 543 U.S. 220 (2005),

the Sentencing Guidelines are no longer mandatory and that the

Court is free to take into account the factors listed in §3553(a)

in fashioning an appropriate sentence.  In discussing those

factors in his sentencing memorandum, Cream has focused only on

those factors that reflect "the history and characteristics of

the defendant." § 3553(a)(1).[5]  Cream has not focused at all on

other, equally-important factors: "the nature and circumstances

of the offense;" the need for the sentence imposed "to reflect

the seriousness of the offense, to promote respect for the law,

and to provide just punishment for the offense;" the need for the

sentence imposed "to afford adequate deterrence to criminal

conduct;" and the need for sentence imposed "to protect the

public from further crimes of the defendant." § 3553(a)(1),

(a)(2)(A), (a)(2)(B), and (a)(2)(C).

Cream was involved in the widespread distribution of high-

---

[5]Indeed, Cream relies exclusively on factors that would not
have warranted a departure under the mandatory Sentencing
Guidelines, what Judge O'Toole referred to as an inherently
suspect "shadow departure where a departure in the sunlight would
be unjustified."  Sagendorf, 2006 WL 102877 at *2.  In Sagendorf,
the Court of Appeals took no view on whether Judge O'Toole's
opinion that a defendant had a high burden of persuasion in such
circumstances accurately stated the law.  Id.

purity OxyContin pills over a substantial period of time.
OxyContin is a highly-addictive substance that is akin to heroin
and that has wreaked havoc in eastern Massachusetts and
particularly on the North Shore, where this drug conspiracy
operated.  OxyContin has destroyed many lives and its use is
closely associated with the use and abuse of heroin since heroin
is far less expensive than OxyContin.[6]  According to statistics
maintained by the Office of Applied Studies, Substance Abuse and
Mental Health Services Administration, patients admitted to
emergency rooms who stated that they had used OxyContin increased
by 450% from 1994 to 2002.  The use and abuse of OxyContin in
eastern Massachusetts has reached alarmingly high numbers.  Cream
has played a not-insignificant role in contributing to the
OxyContin epidemic, particularly on the North Shore.  His
sentence should reflect the "nature and circumstances" of this
egregious offense conduct.

This Court's sentence also should serve to protect the
public for as long as reasonably possible by incapacitating
Cream, thereby preventing him from engaging in further sales of
OxyContin on the North Shore.  It is clear that diversionary

---

[6]For example, the street price in Gloucester for one 80-
milligram OxyContin pill during this conspiracy was $80.  The
undercover agents were able to negotiate the price down to $53
per pill because they were purchasing 100 pills at a time.
Personal-use quantities of heroin are generally available at $10-
$20 per bag.

dispositions and sentences of probation in the state court system have not served to prevent Cream from continuing to engage in serious anti-social and destructive behavior.  A substantial federal prison sentence will protect the public from Cream and hopefully will deter Cream from engaging in such conduct in the future.

### Conclusion

Based on the foregoing, the government respectfully requests that the Court calculate a GSR of 121-151 months and that it impose a sentence at the low end of that GSR, to be followed by a term of supervised release of 6 years, and a $300 special assessment.

Very truly yours,

MICHAEL J. SULLIVAN
United States Attorney

By:   /s/Michael J. Pelgro
Michael J. Pelgro
Assistant U.S. Attorney

DATED:    April 24, 2006.

### Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and that a paper copy will be sent to those indicated as non-registered participants on April 24, 2006.

/s/Michael J. Pelgro

Michael J. Pelgro
Assistant U.S. Attorney